830 A.2d 554

**COMMONWEALTH of Pennsylvania, Appellant**

**v.**

**Gary COLEMAN, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 2002.

Decided Aug. 18, 2003.

Robert A. Willig, Pittsburgh, for the Com. of Pa., Appellant.

Vincent C. Murovich, Pittsburgh, for Gary Coleman, Appellee.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

### OPINION OF THE COURT

Justice CASTILLE.

This case is before the Court following our remand for further consideration in light of our decision in *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655 (2000), where this Court held that Article I, Section 8 of the Pennsylvania Constitution does not categorically prohibit the issuance of anticipatory search warrants. We agree with the Commonwealth that the Superior Court panel below erred in requiring a degree of certitude in this search warrant affidavit that is

inconsistent with the inherently contingent nature of anticipatory warrants. Accordingly, we reverse the order of the Superior Court and remand for proceedings consistent with this Opinion.

On February 27, 1995, Sergeant William Black of the Elizabeth Township Police Department and Detective James Comunale of the North Versailles Police Department prepared an affidavit of probable cause, seeking contingent authority to search appellee's residence. The affidavit averred that a reliable confidential informant (hereinafter "CI") informed Sgt. Black that he could arrange a purchase of cocaine. The affidavit noted that the CI had given information in the past to both the Elizabeth Township Police Department and the McKeesport Police Department that had led to the arrests of other drug law offenders. In the middle part of February, the affidavit continued, the CI, working under the direction of Sgt. Black, was given $100 in "official funds" after a strip search revealed that he had nothing on his person. The CI then met a person identified in the affidavit only as an "unwitting informant" (hereinafter "UI"), who took the CI to a residence in North Versailles where the UI indicated he could purchase cocaine for the CI.

When the UI and the CI arrived at appellee's residence at 300 Dix Drive, at the corner of Dix and Tillman Drives in North Versailles Township, the UI took the $100 from the CI and entered appellee's residence. The UI returned a short time later with cocaine in powder form. The CI and the UI proceeded together to another location, still under the supervision of Sgt. Black. The CI and UI then parted company, at which point the CI met immediately with Sgt. Black, delivering to him the cocaine the UI had purchased from a person in appellee's residence. The powder field-tested positive for cocaine. The transaction took place between 10:00 p.m. and 6:00 a.m.

Sgt. Black informed Det. Comunale of the events occurring during the controlled cocaine buy. Det. Comunale was familiar with the residence where the purchase was made and knew that appellee lived there. A driver's license check and a check

with the United States Postal Service confirmed that appellee lived at 300 Dix Drive, North Versailles. The affidavit noted that Det. Comunale had received numerous tips concerning a high volume of traffic at appellee's residence, especially in the late night and early morning hours. This traffic involved vehicles arriving at appellee's residence, the drivers and/or passengers going into the residence, exiting a short time later, and driving away. Det. Comunale also recounted a traffic stop of appellee in the late 1980s during which he had smelled the odor of burnt marijuana and appellee admitted he had been smoking a marijuana cigarette.

The affidavit further noted that Sgt. Black had directed the CI to arrange a second transaction for March 1, 1995, involving "the same scenario as the first transaction:" *i.e.*, the CI would meet the UI in the early morning hours and the two would go to appellee's residence where the UI would take the CI's official funds and make a drug purchase. The affidavit concluded as follows:

Your affiant [sic] requests then that a nighttime anticipatory search warrant be issued to recover funds based upon the following:

1) The [UI] going into and coming out of 300 Dix Drive and delivering an amount of cocaine to the CI that the [UI] obtained inside the residence at 300 Dix Drive.

2) This same suspected cocaine field testing positive for cocaine.

3) The fact that intelligence both from the CI and other sources revealed that the Gary Coleman who is the actor who resides at 300 Dix Drive sells cocaine throughout the early morning hours regularly and the fact that the official funds given to Coleman by the [UI] might be gone due to future transactions where amounts of currency is [sic] exchanged for cocaine.

4) The CI is a reliable CI who has given information both to the Elizabeth Twp. Police Department and the McKeesport Police Department that has led to the arrest of other drug law offenders.

5) Your affiants have been working for the South East Valley Task force for approximately 7 years and have used confidential informants and has [sic] applied for search warrants in the past with several of these being the anticipatory type.

6) The search warrant will only be executed if the CI receives cocaine from the [UI] who in turn must obtain the cocaine from the residence at 300 Dix Drive in North Versailles Twp.

7) The official funds given the CI will have the serial numbers recorded for absolute proof that the currency is the official funds given to the CI.

Affidavit, p. 2. Paragraph 6 is notable for purposes of our review here, since it made clear that execution of the warrant would be contingent only if there was a successful completion of the anticipated drug buy.

District Justice Georgina G. Franci approved the warrant. The affidavit of probable cause was sworn before District Justice Franci on February 27, 1995, while the warrant itself was issued and dated on February 28, 1995 at 12:00 noon. The warrant authorized entry of 300 Dix Drive at "anytime during day or night" but no later than 12:00 p.m. on March 2, 1995. The warrant listed the items to be searched for as "$100 in official funds," and identified those funds by denomination and serial numbers.

Later that night, police proceeded with the controlled buy, albeit it did not materialize precisely as predicted in the affidavit. Sgt. Black testified at the suppression hearing that he and other police officers met with the CI at approximately 10:30–11:00 p.m. on the night of February 28 and briefed him. The CI then attempted without success to contact the UI by telephone. At that point, the CI offered to approach appellee's residence and attempt to make the controlled buy on his own and police approved of that procedure. Accordingly, at approximately 1:15 a.m. on the morning of March 1, 1995, police supervised a transaction during which the CI, after having both his car and person searched, entered appellee's

residence with the recorded buy money and returned four to five minutes later with cocaine. N.T. July 18, 1996, at 35–36, 43–45.[1]

The controlled buy having been consummated, police executed the anticipatory search warrant and seized over $10,000 in cash, including the $100 in cash identified by serial number on the face of the warrant; cocaine and marijuana; wiretapping equipment; two mechanical scales; two electronic scales; and ten firearms and assorted ammunition. On June 4, 1995, appellee was charged with possession of a controlled substance,[2] possession with intent to deliver,[3] possession of marijuana[4] and possession of drug paraphernalia.[5]

Appellee moved to suppress the evidence seized pursuant to the warrant arguing, among other things, that there was an insufficient basis for the district justice to conclude that evidence of a crime would be found inside his residence at the time the warrant was to be executed. The suppression court denied the motion. On November 12, 1996, a jury found appellee guilty of all charges.

Appellee appealed to the Superior Court, challenging the suppression ruling. In an opinion filed pursuant to Pa.R.A.P. 1925(b), the trial court explained its reasons for denying suppression. The court noted that an anticipatory search warrant "presupposes" that the evidence to be searched for is not then present on the premises. In the trial court's view, such a warrant is proper if the factual averments support a belief that the evidence "will arrive at the place to be searched upon the happening of a particular event." The court noted that law enforcement officers are not obliged to wait until a criminal scheme is brought to fruition before seeking a war-

1. Sgt. Black also testified that the prior drug buy by the UI was made on February 23, 1995. N.T. July 18, 1996, at 31, 37. That testimony, however, cannot factor into this Court's four corners analysis of the sufficiency of the warrant affidavit.

2. 35 Pa.C.S. § 780–113(a)(16).

3. *Id.* § 780–113(a)(30).

4. *Id.* § 780–113(a)(31).

5. *Id.* § 780–113(a)(32).

rant; rather, so long as the issuing authority is presented with sufficient information to support a reasonable belief that there is a fair probability that evidence of past or present criminal activity will be on the premises when searched, the warrant may lawfully issue. Turning to the averments in this case, the court reasoned that the warrant affidavit established both that there was ongoing criminal activity at appellee's residence and a fair probability that there would be evidence of that activity present in the residence on March 1, 1995. The court deemed the evidence concerning the first drug transaction to be sufficient in itself to support a warrant, while the second transaction, "which had to take place before the warrant became valid for execution," "only served to bolster the degree of probable cause already established and to eliminate any staleness problems because the date of the first transaction was as long as two weeks" prior to the warrant application. These averments, as well as the averments concerning the reliability of the CI and other suspicious nighttime activity taking place at appellee's residence, led the court to conclude that the district justice properly issued the warrant. Trial court, Manning, J., slip op. at 5–8.

The Superior Court reversed, holding as a matter of law that "a magistrate's finding of probable cause to issue an anticipatory search warrant may be based only on circumstances presently known to the police and not on the occurrence of triggering events enumerated in the affidavit." *Commonwealth v. Coleman*, 743 A.2d 983, 984–85 (Pa.Super.1999) (*Coleman I*). The Commonwealth sought discretionary review in this Court. We issued a *per curiam* order granting allowance of appeal, vacating the Superior Court's decision and remanding for further consideration in light of this Court's recent decision in *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655 (2000). *Commonwealth v. Coleman*, 563 Pa. 342, 760 A.2d 848 (2000) (per curiam).

Upon further consideration, the Superior Court panel again reversed appellee's judgment of sentence.[6] In light of *Glass*,

6. We note that outright reversal of the judgment of sentence generally is an inappropriate remedy upon finding that a suppression motion

the panel abandoned its prior categorical prohibition upon consideration of "the occurrence of triggering events" in the future, recognizing that an anticipatory warrant need only "be based on a finding of probable cause at the time the warrant is authorized, and may be established by information regarding future events, so long as there is a fair probability that the future events will transpire." *Commonwealth v. Coleman*, 769 A.2d 462, 464 (Pa.Super.2001) (*Coleman II*), *citing Glass*, 754 A.2d at 663. In again deeming the affidavit deficient here, the panel contrasted this case with two other Superior Court panel decisions pre-dating this Court's decision in *Glass*, *i.e.*, *Commonwealth v. Reviera*, 387 Pa.Super. 196, 563 A.2d 1252 (1989) and *Commonwealth v. DiGiovanni*, 428 Pa.Super. 81, 630 A.2d 42 (1993). In the panel's view, in each of those cases the warrant affidavits described circumstances where, although there was no reason to believe that contraband or other evidence of a crime was then on the targeted premises, there was reliable information that contraband would be arriving shortly. In the *Reviera* case, a man suspected of selling drugs from the house told an undercover officer, who had attempted to purchase cocaine, that a cocaine shipment would arrive at 10 p.m. that night. In *DiGiovanni* police had assumed control of a United Parcel Service (UPS) shipment of marijuana to the targeted premises after the UPS had informed authorities that it discovered the contraband in the package. 769 A.2d at 465–66. The *Coleman II* panel also noted that in *Glass* police controlled the anticipated shipment of marijuana to the targeted premises. The *Coleman II* panel characterized these three cases as ones where "the affidavits contained sufficient information to establish a fair probability that the anticipated events would occur." *Id.* at 467.

The panel then distinguished this case because, in its view, there was neither probable cause to search appellee's house based upon past events nor a fair probability that the antici-

should have been granted. The proper relief for an erroneous and prejudicial ruling concerning the admission of evidence is the grant of a new trial. Whether, in light of the suppression ruling, the Commonwealth will be able to go forward with the prosecution is a matter to be determined upon remand.

pated March 1 drug sale would materialize. The panel discounted the evidence concerning the prior drug sale because of the time lapse (from mid-February until the warrant request on February 28) and because the information gleaned from the previous sale did not reveal the quantity of illegal drugs present at appellee's residence. While the panel deemed the prior sale "probative," it reasoned that the prior sale alone did not establish a fair probability that contraband would be present on March 1. The panel then concluded that the averments concerning the anticipated drug transaction on March 1 likewise were insufficient in themselves to support the warrant. In this analysis, the panel quoted from its previous decision in *Coleman I*, where it had opined that there was "'no information ... to indicate that the March 1st transaction would ever occur.'" *Coleman II*, 769 A.2d at 467, *quoting Coleman I*, 743 A.2d at 989. This was so, according to the *Coleman I* panel, because "it was equally plausible for the magistrate to conclude that the unwitting informant would attempt to purchase cocaine on March 1st and would be turned away from [appellee's] residence for any number of reasons." *Id.*

The panel thus viewed the affidavit as amounting to no more than "information regarding a previous isolated incident drug transaction" combined with police "speculati[on] that they could orchestrate a second similar transaction" which would generate probable cause to search appellee's house. *Id.* at 468.[7] In the panel's view, such speculation was insufficient to establish probable cause. Moreover, citing to a decision from an intermediate appellate court in Alaska,[8] the panel flatly rejected the notion that the conditional nature of the warrant—*i.e.*, the fact that its execution was specifically made dependent upon the anticipated drug sale actually materializing on March 1—was relevant to the question of whether probable cause existed at the time the warrant was issued.

7. The panel said nothing about the additional averments concerning a high volume of late-night traffic at appellee's house, or appellee's prior encounter with Det. Comunale, during which he had admitted to smoking marijuana.

8. *State v. Gutman*, 670 P.2d 1166 (Alaska Ct.App.1983).

*Id.* The panel explained its categorical rejection of the execution contingency as follows:

Of course, the police can always conjure up scenarios that would give rise to probable cause. Magistrates, however, may not issue warrants anytime they are presented with a speculative future scenario assured only by the contingency that the warrant will not be executed until probable cause exists. Rather, the affidavit must contain sufficient information to establish probable cause at the time the warrant is authorized. *See Glass,* 754 A.2d at 663. Therefore, a finding of probable cause based upon information regarding future events must at least establish a fair probability that the future events will in fact occur.

*Id.*

■■■ We granted the Commonwealth's allocatur to provide further guidance on the proper contours of anticipatory search warrants. Our review of a suppression court's ruling is limited. Where the record supports the suppression court's factual findings, we will reverse only if the court's legal conclusions based upon these facts are in error. *Glass,* 754 A.2d at 658, *citing Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 429 (1999). In analyzing whether a warrant was supported by probable cause, judicial review is confined to the four corners of the affidavit. *Commonwealth v. Stamps,* 493 Pa. 530, 427 A.2d 141, 143 (1981); *see also* Pa.R.Crim.P. 203(B) ("The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside of the affidavits."). Probable cause, of course, is a practical, non-technical conception requiring a consideration of the totality of the circumstances. *Glass,* 754 A.2d at 661, 663.

"The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to

ensure that the magistrate had a 'substantial basis ... for conclud[ing] that probable cause existed.' "

*Id., quoting Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921, 925 (1985), *in turn quoting Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Finally, since no factual question is involved in a four corners analysis of the sufficiency of a warrant affidavit, the issue is one of law as to which our review is plenary.

■ The Commonwealth argues that the Superior Court's approach, which deemed irrelevant the fact that the warrant's execution was made contingent upon the actual occurrence of the anticipated event (the second drug purchase) ignores the inherently conditional nature of anticipatory search warrants. The Commonwealth contends that the proper approach in the anticipatory warrant context should examine whether there is a fair probability that the evidence to be searched for will be present **if** the described future event occurs, since the warrant's execution is conditioned upon the ripening of that circumstance. In the Commonwealth's view, identification of the "triggering event" in the body of the warrant, and the conditioning of execution upon the occurrence of that event, ensure antecedent judicial control over proposed searches. The Commonwealth also argues that here, as in *DiGiovanni* and *Glass,* the police controlled the delivery of the evidence (the recorded buy money) which was the subject of the anticipatory warrant and thus, under the Superior Court's own analysis, the affidavit should be deemed sufficient. In the Commonwealth's view, the triggering event here was no more inherently speculative than in any other case involving an anticipatory warrant, *i.e.,* there is always a chance that nobody will be home or will respond when the police or a police agent arrives with the evidence, or that the person who answers the door will refuse to accept the goods or evidence or that, for some other reason, the event will not unfold as anticipated.

The Commonwealth further asserts that its approach is consistent with Pennsylvania privacy concerns because if the triggering event does not occur there should be no intrusion under the conditional warrant at all and, if there is an unlawful

intrusion, the remedy of suppression will be available as it is in other cases of unlawful entry. On the other hand, if the anticipated event does occur, the fact that probable cause will exist to search upon its ripening—as determined by a neutral and detached judicial officer—protects the citizenry against unlawful intrusions.[9]

Appellee responds that, even in the anticipatory warrant setting, the magistrate must assess whether, at the time of the warrant's issuance, there is at that time probable cause to believe that evidence will be found on the targeted premises at the time specified in the future for execution. Such probable cause is lacking here, appellee says, because the information concerning the previous drug transaction was stale, because there was insufficient evidence of continuing drug activity on the premises, and because the information concerning the anticipated controlled drug purchase did not satisfy the specificity and reliability strictures required to issue a search warrant. Appellee also argues that this case is distinguishable from *Glass* and *DiGiovanni* because police here did not participate in the controlled delivery of contraband to the premises, but instead controlled the buy money and were relying upon the CI to arrange a drug transaction at the premises. Appellee further argues that the case *sub judice* is distinguishable from *Glass*; *Reviera* and *DiGiovanni* because police in those cases merely "furthered" criminal activity that was already in progress, while police here were hoping to "orchestrate" criminal activity that would then generate probable cause.

Our review necessarily begins with *Glass*, where this Court examined the very nature of the magistrate's probable cause assessment, including the role of "anticipated" events. We noted that, "[t]he very nature of a search warrant is in a sense 'anticipatory.'"

9. The Commonwealth also argues that probable cause existed to believe appellee was dealing cocaine from his home based upon the prior controlled buy and the tips of late night traffic in and out of his residence, even without the anticipated drug buy on March 1. Given our resolution below, we need not reach this argument.

Time being a continuum, the analysis cannot be otherwise. Warrants authorize future searches, not searches into the past. There is always a lag between the underlying observation, the representations of the affiant, the issuance of the warrant, and its ultimate execution. Presented with a series of factual averments, the magistrate must determine, or anticipate, whether there is a fair probability that evidence of a crime "will be found" in a particular place when the warrant is executed. Although probable cause unquestionably must exist at the time the warrant is authorized ..., the magistrate's assessment of probable cause, as well as the ultimate question as to whether the warrant should issue, is distinctly forward-looking.

754 A.2d at 662–63 (citation omitted). We noted further that the fact that search warrant affidavits commonly rely upon past observations or events does not alter the inherently forward-looking nature of the warrant approval determination:

What the past observations do is provide a basis for an expectation or an anticipation that the contraband will still be at the location in question by the time a warrant is secured and executed. *See United States v. Garcia*, 882 F.2d 699, 702 (2d Cir.1989), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989) ("even a warrant based on a known presence of contraband at the premises rests also on the expectation that the contraband will remain there until the warrant is executed"); *People v. Glen*, 30 N.Y.2d 252, 331 N.Y.S.2d 656, 282 N.E.2d 614, 616 (1972) ("At best, present possession is only probative of the likelihood of future possession."). The strength of that expectation, including even the ultimate question whether it is strong enough for probable cause to exist, will then depend upon the usual factors attending a search warrant review, *i.e.*, the recency, specificity, and reliability of the observations and averments.

*Id.* at 663. We further emphasized that "[t]his focus upon what there is a fair probability to believe 'will be found,' as opposed to what merely *was* present in the past, is unavoidable, for the intrusion on privacy authorized by the warrant

will of necessity occur upon future execution." *Id.* (emphasis original). *Accord id.* at 664 ("A magistrate considering an anticipatory warrant is assessing whether there is *then* probable cause to believe that evidence will be found when the warrant *is to be* executed.") (emphases original).

After explaining the future-oriented emphasis of the probable cause analysis in the search warrant context, the *Glass* Court held that it was appropriate for the magistrate to consider information concerning expected future events. Indeed, we noted that information concerning future events can be more reliable than evidence concerning past observations because the often troublesome question of staleness disappears. Thus, "[i]t would be the height of impracticality to ignore such evidence." *Id.* at 664. Accordingly, we concluded that, "in making the practical determination of what amounts to probable cause, the magistrate may consider likely future events, subject to the sorts of specificity and reliability strictures attending all probable cause evaluations." *Id.* In reaching our conclusion, we relied also upon the salutary purpose served by rules encouraging pre-search review by a neutral judicial officer: "Approving this procedure encourages police to seek warrants, thereby ensuring independent pre-search review by a neutral magistrate, while at the same time providing police with the ability to respond quickly to ongoing criminality." 754 A.2d at 660. *Accord id.* at 665 (anticipatory warrants further concern for privacy not only because future-oriented information is often more reliable, "but also because anticipatory warrants interpose the review of a neutral magistrate *before* the intrusion will occur—a practice we have consistently encouraged.") (emphasis original).[10]

10. In a timely and scholarly article, our respected and learned colleague Mr. Justice Saylor explored, among other things, the merit and demerit in bright-line rules versus totality of the circumstances tests in approaching questions of constitutional interpretation. Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule,* 59 N.Y.U. Ann. Surv. Am. L. 283, 295–97 & accompanying notes (2003). Justice Saylor notes that bright-line rules have been defended in the Fourth Amendment arena in part because such standards "dispel uncertainty among government actors including law enforcement by establishing a

*Glass* does not strictly control the outcome here since the challenge in that case was a categorical one to anticipatory warrants as a class; there was no preserved challenge to the sufficiency of the affidavit in *Glass* under the standard this Court articulated. 754 A.2d at 658 & n. 2, 665. Nevertheless, the principles animating the decision in *Glass*—and in particular, our recognition that a magistrate considering an anticipatory warrant "is assessing whether there is *then* probable cause to believe that evidence will be found when the warrant *is to be* executed"—convince us that the Superior Court panel in the case *sub judice* erred in flatly dismissing as irrelevant the fact that execution of this warrant was specifically conditioned upon the actual occurrence of the anticipated drug buy.[11] Viewing this affidavit in a practical, common sense

uniform practice." *Id.* at 296. *See also id.* n. 53 (" 'A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions ... may be literally impossible of application by the officer in the field.' "), *quoting,* Wayne R. LaFave, *"Case–by–Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma,* 1974 Sup.Ct. Rev. 127, 141. This Court, of course, does not have a bright-line rule requiring police to seek anticipatory judicial authorization for searches; but, to the extent our approach encourages the practice in appropriate circumstances, it not only provides clear guidance to the police, but it also promises the special protection to privacy afforded by antecedent judicial review. Since the actual probable cause standard to be employed by the magistrate then employs a totality of circumstances test— the standard "affording the greatest latitude" to the decision maker, *id.* at 296—flexibility in constitutional analysis is also assured.

11. Other jurisdictions likewise recognize that probable cause exists where there is a fair probability that contraband **will be found** when the warrant is executed. *See, e.g., U.S. v. Ricciardelli,* 998 F.2d 8, 10 (1st Cir.1993) ("The probable cause doctrine does not require that the contraband to be seized must presently be located at the premises to be searched, only that there is probable cause to believe that a crime has been (or is being) committed and that evidence of it can likely be found at the described locus at the time of the search."); *United States v. Aguirre,* 839 F.2d 854, 857–58 (1st Cir.1988) probable cause exists where warrant "demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." (*citing Illinois v. Gates,* 462 U.S. 213, 230–35, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *Brinegar v. United States,* 338 U.S. 160, 169–71, 69 S.Ct. 1302, 93 L.Ed. 1879, (1949); *People v. Glen,* 30 N.Y.2d 252, 331 N.Y.S.2d 656, 282 N.E.2d 614 (1972) (affidavit of probable cause

fashion, we believe that the district justice had a substantial basis to conclude that the search she approved, which was authorized only if the anticipated drug buy materialized, was supported by probable cause.

The affiants here did not simply request a search warrant in anticipation of their approaching a home or homes at random, seeking to purchase illegal drugs, and then entering if the occupant indeed had drugs for sale. The police interest in appellee's home was bottomed upon specific information from a reliable confidential informant that was then corroborated by an actual, controlled purchase of cocaine earlier that month. In addition, other tips Detective Comunale had received, relating that there was a high volume of late-night and early-morning activity at the residence—activity which was consistent with the very type of controlled drug buy police had supervised here—suggested that the controlled buy was not an isolated or one-time incident. Thus, contrary to the Superior Court panel's expressed concern, when the affiants detailed their intention to attempt another controlled buy in the same manner here, it was not a case of police "conjur[ing] up [a] scenario[ ] that would give rise to probable cause." Rather, police targeted a location they believed to be housing an ongoing retail drug enterprise, detailed their intention to engage in a buy similar to the previous one and similar to the nature of the enterprise, and then requested approval to search if, and only if, the anticipated drug buy succeeded.

The police, of course, could not be absolutely certain that the drug buy outlined in the affidavit would unfold as anticipated. As the Superior Court noted, the informant/buyer could have been turned away from the residence "for any number of reasons." But, as the Commonwealth correctly responds, that is a possibility in all cases of anticipatory warrants. Thus, in *Reviera*, the expected shipment of cocaine could have been delayed; or it may never have arrived because the supplier reneged or noticed police in the area; or the man revealing the anticipated delivery may have been

sufficient where "evidence creates substantial probability that the seizable property will be on the premises when searched").

lying. Similarly, in both *Glass* and *DiGiovanni*, where the police controlled the delivery of contraband, the designated recipient may not have been home, or could have refused delivery, etc. These uncertainties inherent in any human enterprise do not act to negate what is fairly probable. Here, police proposed to make the buy at a time and in a manner that was likely to succeed, given the nature of the enterprise they uncovered. Moreover, by making the warrant's execution contingent upon the anticipated buy materializing, both the police and the district justice made sure that no intrusion would occur absent probable cause.

■ We believe that, at the time the search warrant was issued, there was a fair probability of the anticipated event occurring. Moreover, because of the contingent nature of the warrant, there was an overwhelming probability that, at the time police would actually enter the residence under authority of this warrant, evidence of a crime—specifically, the marked buy money—would be found there. To disapprove of this anticipatory search warrant would force police to await the actual occurrence of the anticipated event, proceed to a police station to type up a warrant affidavit, find a magistrate in the middle of the night, and seek approval, all the while risking that the evidence would disappear and permitting additional sales of narcotics to occur. The purpose of the warrant protection is not to pointlessly hinder the conscientious efforts of law enforcement to discover and address criminal activity: it is to ensure that, before intrusions are made, neutral judicial officers pass upon the question of the basis for a belief that evidence of a crime will be found at the place to be searched. In negating the warrant, the Superior Court panel committed an error similar to the one it committed in *Coleman I:* it categorically refused to consider a specific type of forward-looking circumstance—here the execution contingency—and thus failed to consider the totality of the circumstances.

■ The Second Circuit Court of Appeals has noted that an affidavit "supporting the application for an anticipatory search warrant must show, not only that the agent believes a delivery

of contraband is going to occur, but also *how* he has obtained this belief, how reliable his sources are, and what part government agents will play in the delivery." *U.S. v. Garcia,* 882 F.2d 699, 703 (2d Cir.1989) (emphasis original). The Second Circuit's approach articulates a workable standard for what should be included in an affidavit of probable cause seeking an anticipatory search warrant. This case thus reveals the importance of law enforcement officers including all pertinent historical information in the affidavit of probable cause. Police here did not randomly target appellee's residence for a controlled drug buy in the hope of generating probable cause, but instead explained in the affidavit the specific basis for their belief that drugs were being sold from this particular residence. Viewing the totality of the averments, including the execution contingency, we conclude that the anticipatory search warrant was properly issued.[12]

This conclusion, however, does not end the case. We are aware that, in *Coleman I,* the Superior Court panel noted that appellee raised three questions for review, consisting of whether (1) the warrant met the requirements for an anticipatory warrant; (2) there was sufficient probable cause; and (3) the warrant was prematurely executed. The *Coleman I* court noted that it did not need to address the third question since it had ruled in favor of appellee on the first two. *Coleman I,* 743 A.2d at 983. The *Coleman II* panel likewise confined its reconsideration to the first two questions. Since the Superior Court has yet to address the question of premature execution, we remand for that purpose, offering no view on the merits.

Accordingly, we reverse the decision of the Superior Court and remand the matter to that court for consideration of appellee's remaining appellate claim.

12. We note that the anticipated sale here did not materialize in the precise manner that was described in the affidavit, *i.e.,* after the CI proved unable to reach the UI, the CI acted on his own in making the controlled cocaine buy from appellee's residence. No question is presented to us concerning whether this discrepancy affects the validity of the warrant and, accordingly, we express no view on that question.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice NIGRO files a dissenting opinion.

Justice NIGRO dissenting.

This Court held in *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655 (2000), that anticipatory search warrants do not *per se* violate Article I, Section 8 of the Pennsylvania Constitution, but we also recognized that "whether a particular anticipatory warrant should or should not be approved, of course, will depend upon the sufficiency of the averments in the individual case." 754 A.2d at 665. Here, the police obtained a warrant essentially based on averments that they hoped to orchestrate a drug buy and needed an anticipatory warrant to permit them to promptly seize the marked currency they intended to use in the transaction, while the money remained on the premises. Although the majority holds that the warrant was properly issued, I disagree and therefore respectfully dissent.

In *Glass*, this Court indicated that anticipatory search warrants are necessary to "provid[e] police with the ability to respond quickly to ongoing criminality." *Glass*, 754 A.2d at 660. As we explained:

Absent the anticipatory warrant tool, police, with probable cause to believe that drugs will be delivered to a location, must wait until after the delivery to take any action. At that point, police are forced to choose between attempting to obtain a search warrant, or conducting a warrantless entry and search immediately after the delivery in the belief that sufficient exigent circumstances exist to justify that action. The former course risks distribution or destruction of the contraband, while the latter runs the risk of suppression if the courts disagree with the on-the-spot police assessment of probable cause and exigency. Authorizing anticipatory warrants resolves this real-world dilemma in a fashion that far better serves Article I, § 8's concerns with privacy and the warrant requirement.

754 A.2d at 665. From this explanation, it seems apparent that the purpose of anticipatory search warrants is to respond to "ongoing criminality" which is moving at such a pace that failure to act expeditiously upon the occurrence of an antici- pated event will pose an unacceptable risk of losing critical evidence. Thus, the classic anticipatory warrant case is one in which a delivery of contraband is in transit from one location to another, and the police seek a warrant to search the delivery destination immediately upon the contraband's arriv- al, before the contraband is further dispersed. *See, e.g., Commonwealth v. Reviera,* 387 Pa.Super. 196, 563 A.2d 1252, 1256 (1989) ("When the police receive reliable information that a shipment of contraband will arrive at a specific location, they are faced with a fast-moving situation requiring them to decide between conducting a warrantless search or risking the delay needed to secure a warrant at the last possible mo- ment.")

The instant case is far from that classic example. Here, according to the Commonwealth, Appellee had been selling drugs out of his house for an extended period of time. There is no allegation that a particularly large drug delivery was in transit to Appellee's home, much less that a large delivery was expected to arrive and depart in short order. To the contrary, the police in this case, on their own independent timetable, simply planned to attempt a second controlled drug buy and then sought an anticipatory warrant, purportedly to protect against their own marked buy money leaving the premises before a warrant could be obtained and executed.

The majority appears to blindly accept this justification, asserting that "[t]o disapprove of this anticipatory search warrant would force police to await the actual occurrence of the anticipated event, proceed to a police station to type up a warrant affidavit, find a magistrate in the middle of the night, and seek approval, all the while risking that the evidence would disappear and permitting additional sales of narcotics to occur." Op. at 564. However, I view this justification as mere artifice. If, in fact, Appellee's residence housed an ongoing drug operation, a search after completion of the

second controlled drug buy and acquisition of a traditional warrant would surely turn up an abundance of physical evidence, which, combined with the evidence of the two controlled drug buys, would render recovery of the marked money of negligible importance. I therefore do not believe that the purported need to recover that money justifies departure from our traditional requirement that warrants be issued based on established facts. I also reject the majority's assertion that the police here could not spare the time to get a traditional search warrant, because to do so would permit "additional sales of narcotics to occur." Not only could the same argument be made with respect to *any* ongoing drug operation, but here, the police were obviously not overly troubled by the fact that additional sales were occurring, as they had harbored suspicions of an ongoing drug operation for weeks and had nevertheless let significant time pass between the first controlled drug buy and the second.

As I simply do not believe that approving the warrant at issue here advances the apparent purpose for which this Court has approved anticipatory warrants, I would conclude, as the Superior Court did, that the warrant is invalid.